UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF WISCONSIN

LANIS E. SOLOMON, JR.,

        Plaintiff,

                          Case No. 18-cv-1922-pp

  v.

SCOTT SOBEK, MICHAEL HANNAH,
JOSHUA MIKULECKY,
LIEUTENANT JOSHUA BRIGGS,
BENJAMIN JACKSON, and KONGPHENG VANG,

        Defendants.

---

**ORDER DENYING PLAINTIFF'S MOTIONS TO AMEND COMPLAINT (DKT. NOS. 26, 36), GRANTING PLAINTIFF'S MOTION TO WITHDRAW AMENDED COMPLAINT (DKT. NO. 28), DENYING PLAINTIFF'S MOTIONS TO COMPEL (DKT. NOS. 37, 45), GRANTING IN PART AND DENYING IN PART PLAINTIFF'S MOTIONS FOR EVIDENTIARY HEARING OR REVIEW (DKT. NOS. 46, 47), DENYING PLAINTIFF'S MOTION FOR ORDER TO VIEW EXHIBIT VIDEOS (DKT. NO. 75), DENYING PLAINTIFF'S MOTIONS TO APPOINT COUNSEL (DKT. NOS. 42, 70), GRANTING DEFENDANTS' MOTION FOR LEAVE TO FILE OVERSIZE STATEMENT OF FACTS (DKT. NO. 48), GRANTING PLAINTIFF'S MOTION TO FILE STIPULATED FACTS AND EXHIBITS (DKT. NO. 69), GRANTING DEFENDANTS' MOTION FOR SUMMARY JUDGMENT (DKT. NO. 50) AND DISMISSING CASE**

---

On December 6, 2018, the plaintiff, a prisoner who is representing

himself, filed a complaint alleging that his rights were violated when he was

subject to a body cavity search at the Milwaukee County Jail. Dkt. No. 1. On

February 5, 2019, U.S. District Judge J.P. Stadtmueller[1] screened the

---

[1]On January 31, 2020, Judge Stadtmueller recused himself from the case
under U.S.C. §455(a) and the clerk's office transferred the case to this court for
disposition. Dkt. No. 78.

complaint and allowed the plaintiff to proceed on a Fourth Amendment claim of unlawful search and a Fourteenth Amendment claim of excessive force against officers Scott Sobek, Michael Hannah, Joshua Mikulecky, Joshua Briggs, Benjamin Jackson and Kongpheng Vang ("the defendants"). Dkt. No. 12. Judge Stadtmueller also denied the plaintiff's motions for appointment of counsel without prejudice on the grounds that the plaintiff had failed to demonstrate reasonable efforts to secure counsel and that he had not demonstrated that he lacked the capacity to litigate. Dkt. Nos. 14, 24 at 6 n.2. The parties subsequently filed a series of miscellaneous motions that the court will address in Section One below. The defendants have filed a motion for summary judgment, dkt. no. 50, which is now fully briefed. As explained in Section Two, the court will grant the motion for summary judgment and dismiss the case.

## I.     MISCELLANEOUS MOTIONS

### A.     <u>Motions to Amend (Dkt. Nos. 26, 28, 36)</u>

The plaintiff filed his original complaint on December 6, 2018. Dkt. No. 1. A week later, he amended the complaint without leave of court (as he had a right to do under Fed. R. Civ. P. 15(a)(1)). Dkt. No. 6.

About three months later, the plaintiff filed a motion to amend the complaint, (Dkt. No. 26), followed by a motion to *withdraw* the amended complaint, (Dkt. No. 28), followed by another motion to amend/correct the complaint, (Dkt. No. 36). The court will grant the motion to withdraw the amended complaint (Dkt. No. 28) and will deny as moot the first motion to amend the complaint (Dkt. No. 26).

In the most recent motion to amend the complaint, the plaintiff noted that the court had characterized his excessive force claim under the Fourteenth Amendment. Dkt. No. 36 at 1. This is true; Judge Stadtmueller explained in his screening order "[b]ecause [the plaintiff] was a pre-trial detainee at the time of the relevant incident, his claim arises under the Due Process Clause of the Fourteenth Amendment," which "affords broader protection than the Eighth Amendment's protection against only punishment that is 'cruel and unusual.'" Dkt. No. 12 at 4 (citing Wilson v. Williams, 83 F.3d 870, 875 (7th Cir. 1996)). The plaintiff says in his motion to amend that he believes both the Eighth Amendment *and* the Fourteenth Amendment standards should apply "for such a[] delicate matter." Dkt. No. 36 at 1. He asks the court to "verify" its decision to consider his claim only under the Fourteenth Amendment standard, and asks that if he's made some error, the court allow him to correct it. Id. at 1-2.

The plaintiff has not made any error, and there is no reason for him to amend the amended complaint. The Eighth Amendment protects *sentenced prisoners* from the infliction of cruel and unusual *punishment.* Lewis v. Downey, 581 F.3d 467, 473 (7th Cir. 2009) (citing Williams, 83 F.3d at 875). But *pretrial detainees* haven't been convicted or sentenced, so they are not "'punishable' under the law." Id. (citing Bell v. Wolfish, 441 U.S. 520, 535 (1979)). A pretrial detainee's claim that he was subjected to excessive force falls under the Fourteenth Amendment due process clause. Id. (citing, *e.g.,* Brown v. Budz, 398 F.3d 904, 910 (7th Cir. 2005)). Because the plaintiff was a *pretrial* detainee during the events described in the amended complaint, his claim that

3

he was subjected to excessive force (and treated cruelly) is subject to the Fourteenth Amendment due process standard. The court will deny the May 2019 motion to amend as unnecessary. The amended complaint (Dkt. No. 6) is the operative complaint.

B.     Discovery Motions (Dkt. Nos. 37, 45, 46, 75)

The rules require parties to respond promptly and in good faith to discovery requests. Fed. R. Civ. P. 26(a), 33(b)(2) and 34(b)(2). If a party fails to respond, the opposition may file a motion to compel. Fed. R. Civ. P. 37(a). Before doing so, however, Civil Local Rule 37 requires the moving party to consult with the opposing party to attempt to resolve the issue. The rule requires a written certification that the moving party attempted, in good faith, to confer with the other side before he filed a motion to compel. Civ. L.R. 37.

The plaintiff filed a motion to compel the production of certain documents. Dkt. No. 37. The defendants responded that the motion was pre-emptive and somewhat moot because the plaintiff filed it before attempting to confer, and because the defendants already had mailed many of the requested documents to the plaintiff the day after he filed his motion. Dkt. No. 38 at 1–2. The defendants also point out that some of the items the plaintiff asked for in the motion to compel were items he'd never asked for in his April 18, 2019 discovery demand. Id. at 2. The defendants are correct. Even though the plaintiff isn't a lawyer and is representing himself, he is obligated to follow the federal and local rules just like any other litigant, including serving discovery requests on opposing counsel and attempting to confer about any disputes

4

before raising them with the court. Civil L.R. 37. The court will deny the plaintiff's June 2019 motion to compel. Dkt. No. 37.

The plaintiff also filed a motion asking the court to order the defendants to compel surveillance footage. Dkt. No. 45. The plaintiff wasn't asking the court to order the defendants to give *him* the footage; he wanted the defendants to give the footage to *the court* so that the court could review it. Id. at 1-1. The court has August 9, 2018 video footage from two Unit 4D recreation cameras, the medical clinic waiting room camera, the Pre-Booking and Booking Room cameras and a search camera. Dkt. No. 54. The court will deny this motion to compel as moot.

The plaintiff filed a document titled "Notice of Evidence and Motion of Evidentiary Review." Dkt. No. 46. The motion is two pages long and asks the court to review the attached sixty pages of evidentiary materials (dkt. no. 46-1). The court will grant the motion; it has considered these materials in ruling on the defendants' motion for summary judgment. A few days later, the court received from the plaintiff a "Notice of Evidence and Motion of Evidentiary Review/Hearing." Dkt. No. 47. The court isn't clear as to what the plaintiff seeks in this order. If he simply wanted to make sure the court reviewed the video footage, his motion is unnecessary—as the court has noted, it has the surveillance footage and has considered it in ruling on the motion for summary judgment. The plaintiff mentions that he is "having complications" reviewing the footage he received from defense counsel, but he doesn't appear to ask the court to do anything about that. Id. at 1. The plaintiff also says he doesn't have

the money to send all his exhibits to the court, <u>id.</u> at 2; if he's referring to the video footage, again, the court has it. The court will grant this motion to the extent that the plaintiff is asking the court to consider the video footage in making its decision and deny the plaintiff's request for a hearing.

Finally, about a month after it received the previous motion, the court received from the plaintiff an affidavit (docketed as a motion for an order to view videos). Dkt. No. 75. The plaintiff explained in the affidavit that he'd recently been transferred from Waupun Correctional Institution to the Milwaukee County Jail as a pre-trial detainee.[2] <u>Id.</u> at 1. He says that when he was being processed into the jail, he was told by Lieutenant Anthony Emanuele that under jail policy, he couldn't view the video film footage without a court order. <u>Id.</u> He asked the court to issue an order stating that he should be allowed to review the footage. <u>Id.</u> The plaintiff also indicated that he was told that Jail Commander Aaron Dobson had "just" instituted the policy. <u>Id.</u>

The court is troubled by these allegations; inmates should have access to their legal materials when they are engaged on on-going litigation, regardless of where they are incarcerated. But in his response to the defendants' proposed findings of fact, prepared two weeks *before* he was transferred to the Milwaukee County Jail, the plaintiff referenced specific portions of the video exhibits. Dkt.

---

[2] The Wisconsin Department of Corrections Inmate Locator web site shows that when the plaintiff filed his requests for evidentiary review and hearing, he was in custody at Waupun Correctional Institution. The site indicates that he was released on mandatory release to supervision on October 8, 2019—the same day the plaintiff indicates that he was transferred to the Milwaukee County Jail as a pre-trial detainee. <u>See</u> https://appsdoc.wi.gov/lop/detail.do.

No. 68 at 5-6. The briefing is complete; there is no need for the plaintiff to review the exhibits at this point. The court will deny the motion as moot.

      C.    <u>Motions to Appoint Counsel (Dkt. Nos. 42, 70)</u>

The plaintiff filed two motions to appoint counsel; he filed the first motion four days after the close of discovery, dkt. no. 42, and the second one after he'd responded to the summary judgment motion, dkt. no. 70.

In a civil case, the court has the discretion to recruit counsel for individuals unable to afford counsel. <u>Navejar v. Iyola</u>, 718 F.3d 692, 696 (7th Cir. 2013); 28 U.S.C. §1915(e)(1); <u>Ray v. Wexford Health Sources, Inc.</u>, 706 F.3d 864, 866–67 (7th Cir. 2013). "[D]eciding whether to recruit counsel 'is a difficult decision: Almost everyone would benefit from having a lawyer, but there are too many indigent litigants and too few lawyers willing and able to volunteer for these cases.'" <u>Henderson v. Ghosh</u>, 755 F.3d 559, 564 (7th Cir. 2014) (quoting <u>Olson v. Morgan</u>, 750 F.3d 708, 711 (7th Cir. 2014)).

In exercising its discretion, the court must consider two things: "(1) 'has the indigent plaintiff made a reasonable attempt to obtain counsel or been effectively precluded from doing so,' and (2) 'given the difficulty of the case, does the plaintiff appear competent to litigate it himself?'" <u>Pennewell v. Parish et al.</u>, 923 F.3d 486, 490 (7th Cir. 2019) (quoting <u>Pruitt v. Mote</u>, 503 F.3d 647, 653 (7th Cir. 2007)). To satisfy the first prong, the court must determine that a plaintiff made a good faith effort to hire counsel. <u>Pickett v. Chi. Transit Authority</u>, 930 F.3d 869, 871 (7th Cir. 2019). To do so, the plaintiff must show that he contacted at least three lawyers and must provide the court with (1) the

lawyers' names; (2) their addresses; (3) how and when the plaintiff attempted to contact the lawyer; and (4) the lawyers' responses.

The lawyers' responses may bear on the court's decision to exercise its discretion because they may shed light on whether the plaintiff's attempts to hire counsel were reasonable. <u>Pickett</u>, 930 F.3d at 871. In deciding whether to recruit counsel, the court should consider the reasons the lawyer declined representation, including whether the plaintiff was unwilling (as opposed to unable) to pay a retainer; whether the lawyer lacked time or capacity to take on new clients; or whether the subject matter of the case requires a lawyer who specializes in a specific area of law. <u>Id.</u> The court also should consider how well the plaintiff articulated his case to the prospective lawyer. <u>Id.</u> Where a plaintiff "conveyed his situation well and counsel deemed the claim feeble, then it would be inappropriate for a court to intervene" and recruit counsel. <u>Id.</u> But, where a plaintiff is inarticulate, then a court "may have a useful role to play in recruiting counsel." <u>Id.</u>

When considering the second element, the court "must examine the difficulty of litigating specific claims and the plaintiff's individual competence to litigate those claims without counsel." <u>Pennewell</u>, 923 F.3d at 490. The court looks at "whether the difficulty of the case, factually, legally, and practically, exceeds the litigant's capacity as a layperson to coherently litigate the case." <u>Id.</u> This includes "all tasks that normally attend litigation," such as "evidence gathering, preparing and responding to court filings and motions, navigating discovery, and putting on a trial." <u>Id.</u> at 490–91. The court "must consider the

plaintiff's literacy, communication skills, education level, litigation experience, intellectual capacity, psychological history, physical limitations and any other characteristics that may limit the plaintiff's ability to litigate the case." Id. at 491. In situations where the plaintiff files his motion in the early stages of the case, the court may determine that it is "impossible to tell whether [the plaintiff] could represent himself adequately." Pickett, 930 F.3d at 871.

These are the third and fourth motions to appoint counsel the plaintiff has filed. In denying the plaintiff's first motion for appointment of counsel, Judge Stadtmueller pointed out that the plaintiff claimed to have tried to obtain lawyers through the NAACP and the ACLU, and supported this claim "by attaching an illegible screen shot of his mail log." Dkt. No. 14 at 5. Judge Stadtmueller couldn't tell from that documentation whether the plaintiff had made a reasonable effort to hire counsel on his own, but even if he had, Judge Stadtmueller found that the plaintiff had presented no argument that he couldn't litigate the case himself at that stage. Id. at 6-8. Judge Stadtmueller denied the plaintiff's second motion to appoint counsel as moot, because he filed it a week after Judge Stadtmueller denied the first motion (likely because the plaintiff had been transferred to a different facility before he received the judge's order). Dkt. No. 24 at 6 n.2.

In his third motion, filed four days after the discovery period closed, the plaintiff acknowledged Judge Stadtmueller's statement in the scheduling order that he would not consider motions to appoint counsel until after discovery closed. Dkt. No. 42 at 1 (citing Dkt. No. 24 at 6). Given that discovery had

closed, he asked the court to consider his third motion because he had a history of mental health issues and was on medication for seizures. Id. at 2. The plaintiff asserted that he had "written a array of law firms and through his attempts out of his o[w]n finances (Postage) usage none has corresponded back with a letter of disapprovel making it complicated to provid proof of his attempts." Id. The plaintiff stated that he had "once provided a copy of his mailing log which did not please[] the Courts as proof of several attempts as well." Id.

The plaintiff's third motion did not meet the first or second prongs of the Pruitt test. He indicated that he had written to many law firms but didn't name any of the firms or the lawyers. He took issue with Judge Stadtmueller's inability to read the proof he submitted with his first motion, but did not provide more legible evidence. When the plaintiff filed this third motion, the court had no way to determine whether the plaintiff had made a reasonable attempt to find a lawyer on his own.

Even if Judge Stadtmueller had evidence to conclude that the plaintiff had tried to find his own lawyer, the case history did not support the plaintiff's claim that he couldn't represent himself—even with his history of mental illness and his seizure disorder. In the four months between the date Judge Stadtmueller issued the scheduling order and the date the plaintiff filed his third motion to appoint counsel, the plaintiff filed a motion to amend the complaint, a motion to withdraw that motion, two notices of change of address, a letter asking for confirmation that the defendants hadn't filed a motion to

dismiss (in which the plaintiff recounted several of the provisions of Judge Stadmueller's scheduling order), interrogatories, a motion to amend/clarify and a motion to compel discovery. These motions were clear, legible and understandable. In several of them, the plaintiff demonstrated that he had received Judge Stadtmueller's prior orders and that he understood them. In seeking appointment of a lawyer, the plaintiff stated that he wanted "justification" from the point of view of a "licensed law person." Id. The court understands this desire; almost every incarcerated plaintiff wants exactly that. But as Judge Stadtmueller painstakingly explained in his order denying the plaintiff's first motion to appoint counsel, there are not enough volunteer lawyers to represent everyone who'd like a lawyer's input. The court will deny this motion.

The plaintiff's fourth motion to appoint counsel is identical to the third one, except for the timing—he filed this one after he'd responded to the defendants' motion for summary judgment. Dkt. No. 70. This motion suffers from the same deficiencies as the third motion. Further, at this point, there is nothing for an appointed lawyer to do, even if the plaintiff had satisfied both prongs of the Pruitt test. The summary judgment motion is fully briefed. Nothing remains but for the court to rule on it, and the court does that in this order. The court will deny the fourth motion to appoint counsel.

## II.     SUMMARY JUDGMENT MOTION (DKT. NO. 50)

A.     Legal Standard

Federal Rule of Civil Procedure 56 provides that the court "shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); Boss v. Castro, 816 F.3d 910, 916 (7th Cir. 2016). A fact is "material" if it "might affect the outcome of the suit" under the applicable substantive law. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). A dispute of fact is "genuine" if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." Id. The court construes all facts and reasonable inferences in the light most favorable to the non-movant. Bridge v. New Holland Logansport, Inc., 815 F.3d 356, 360 (7th Cir. 2016). The court must not weigh the evidence presented or determine credibility of witnesses; the Seventh Circuit instructs that "we leave those tasks to factfinders." Berry v. Chi. Transit Auth., 618 F.3d 688, 691 (7th Cir. 2010). The party opposing summary judgment "need not match the movant witness for witness, nor persuade the court that h[is] case is convincing, [he] need only come forward with appropriate evidence demonstrating that there is a pending dispute of material fact." Waldridge v. Am. Hoechst Corp., 24 F.3d 918, 921 (7th Cir. 1994).

B.     Procedural Issues

The defendants filed a motion for leave to file an oversized statement of fact. Dkt. No. 48. The court grants that motion.

12

The plaintiff filed a motion of stipulated facts and exhibits, which contains the same documents he attached to his motion for evidentiary review (Dkt. No. 46), but in different order. Dkt. No. 69. The court grants the plaintiff's motion and has considered the documents in formulating its ruling.

Finally, in the plaintiff's response to the defendants' proposed findings of fact, the plaintiff refers to allegations in his amended complaint. Dkt. No. 68. The court notes that the plaintiff signed the amended complaint under penalty of perjury. Dkt. No. 6 at 5. This makes the amended complaint a "verified complaint," which is "the equivalent of an affidavit for purposes of summary judgment, because it 'contains factual allegations that if included in an affidavit or deposition would be considered evidence, and not merely assertion.'" Beal v. Beller, 847 F.3d 897, 901 (7th Cir. 2017) (quoting Ford v. Wilson, 90 F3d 245, 246 (7th Cir. 1996)). The court will treat the verified amended complaint as evidence for summary judgment purposes.

C.    Relevant Facts

At some point on the evening of August 8, 2018, while the plaintiff was a pretrial detainee at the Milwaukee County Jail, he took possession of a key that was dropped on the floor by jail staff. The key could be used to unlock a type of restraint called a "RIPP" belt, which consists of a waist restraint and handcuffs. It is not clear when the officers realized that the plaintiff had the key. The next morning, at 6:41 a.m., the officers conducted a pat-down search of the plaintiff, searched his room, placed him in restraints and let him shower. After the shower, the plaintiff returned to his cell wearing the restraints.

Between 7:00 a.m. and 7:05 a.m., a back-and-forth occurred in which the plaintiff took off the belt portion of the restraint, pushed it under his cell door and into the common area, pulled it back into his cell, then pushed it under his cell door again. It is not clear whether the correctional officers suspected the plaintiff of having the key at this point. The parties agree that at 7:05 a.m., "housing unit officers were able to retrieve [the restraint] when [the plaintiff] pushed it under the cell door again." Dkt. No. 68 at 7. At 7:15 a.m., the plaintiff claimed to be suicidal and was promptly evaluated in his cell by a psychiatric social worker, who placed him on suicide watch. At 8:44 a.m., the correctional officers placed the plaintiff in restraints again and helped him into a suicide gown. Dkt. No. 51 at 8.

At 8:48 a.m., the plaintiff was sent to a recreation area, still wearing the restraints. While in one of the recreation areas, the plaintiff was observed on the ledge of the cell window, locking his restraints to the window. Seeing this, the correctional officers removed the plaintiff from the recreational area and, at 9:13 a.m., the plaintiff was taken to the Jail Medical Clinic.

The defendants explain that at this point, the plaintiff was "clothed in red pants and a gray Milwaukee County t-shirt." Id. at 9. The record does not indicate when he changed from his suicide gown into those clothes. In any case, the plaintiff was questioned about the whereabouts of the key. The plaintiff responded that it was in his rectum. The plaintiff was taken to Froedtert Memorial Lutheran Hospital for evaluation and treatment. At the hospital, an x-ray confirmed that the plaintiff had the key in his rectum. The

plaintiff did not consent to removal of the key, so he was returned to the Milwaukee County Jail with the key still in his rectum.

Back at the Milwaukee County Jail, staff attempted to convince the plaintiff to voluntarily surrender the key, but he refused. Accordingly, at around 1:14 p.m., the officers conducted a custodial search and dressed the plaintiff in a suicide gown. The plaintiff asserts that this was a strip search, not a custodial search. The video shows the booking area, not the holding cell; it shows the plaintiff moving from the booking area into the holding cell with at least two officers and the suicide gown, but does not show what happened inside the holding cell. Over the course of two minutes, the plaintiff's shirt is tossed through the holding cell door into the booking area, followed by his pants.[3] The video does not include audio, so it is impossible to corroborate either party's account of what happened during those two minutes.

The plaintiff was detained in the holding cell, which contained a bedpan. Hannah and Briggs were left to observe the plaintiff. At some point in the afternoon, the plaintiff took off his suicide gown and defecated into the bedpan. At 3:35 p.m., the officers realized that the plaintiff was naked. Correctional

---

[3]Any dispute as to whether the plaintiff was naked when he was searched is not material to the plaintiff's constitutional claim because pretrial detainees may be subjected to strip searches if the searches are reasonably related to legitimate penological interests. Florence v. Bd. of Chosen Freeholders of Cty. of Burlington, 566 U.S. 318, 328, 330 (2012) (affirming the constitutionality of mandatory visual strip searches of pre-trial detainees absent reasonable suspicion to believe contraband is hidden). While Wisconsin law prohibits strip searches that are not approved by the sheriff or designee and conducted by either a physician, a physician's assistant, or a registered nurse, see Wis. Stat. § 968.255, the plaintiff has not asserted a violation of state law.

Officer Vang provided the plaintiff a white sheet with which to cover himself, and escorted him to a nearby chair while his feces were searched. The key was not found. The officers searched the plaintiff's feet, hands and mouth but did not find the key. At 3:54 p.m., the correctional officers returned the plaintiff to his holding cell. Officers Jackson, Vang and Mikulecky stabilized the plaintiff against the wall in order to change him from the sheet back into the suicide gown. At 3:59 p.m., the plaintiff again was secured inside the cell and placed on one-on-one observation.

At 4:09 p.m., the plaintiff was observed lying on the floor of the cell. A group of officers came to the holding cell. Several officers, including Hannah, Briggs and Jackson, entered the cell and dressed the plaintiff in his red pants and gray tee shirt so that a custodial search could be conducted.

Here, the parties' accounts diverge: The plaintiff states that he was naked during the search and the officers came "in contact" with his rectum (dkt. no. 6 at 3) and digitally penetrated him (dkt. no. 56-1 at 135:10–12). The defendants attest that the plaintiff was fully clothed during the search and never was digitally penetrated. The video evidence does not confirm either account; it takes place out of the camera's scope, in a different room, without audio. The parties also dispute whether the plaintiff was compliant during this search. The parties agree that wall stabilization techniques were used, but the plaintiff contends that he was struck in the head several times during the search. Again, the video does not capture this portion of the search—all that one can

see is a group of officers crowding the doorway to the holding cell. No key was found.

At 4:21 p.m., the plaintiff was placed back in restraints and returned to the cell. The officers began to wonder whether the plaintiff had swallowed the key after excreting it. There were concerns that the key might injure the plaintiff if it became lodged in his digestive tract. At 6:12 p.m., jail staff changed the plaintiff back into his red pants and gray tee-shirt and took him back to the hospital. At the hospital, the plaintiff refused examination and treatment, and was warned about the possible detrimental effects of a key passing through his digestive tract. The plaintiff returned to the jail at 9:22 p.m. and was placed back in the holding cell at 9:39 p.m.

At around 10:35 p.m., because of the plaintiff's refusal to allow medical extraction of the key, his refusal to remove it himself and his apparent anatomical ability to keep the key from passing naturally, the correctional officers threatened the plaintiff with pepper spray if he did not release the key. The plaintiff refused to surrender the key, so Hannah ordered the plaintiff to be pepper sprayed. Shortly after the administration of pepper spray, the plaintiff voluntarily surrendered the key.

The defendants explain that the plaintiff's possession of the key posed a serious security risk to the jail. First, there was a fear that he would attempt to harm one of his fellow inmates, a correctional officer or a medical employee with the key—either by using it as a weapon or by manipulating his or others' restraints. Second, there was a concern that he would use the key or the

restraints to harm himself, particularly because he had been on suicide watch earlier that day. Finally, if the plaintiff had swallowed the key, there was concern that it would cause serious injury to the plaintiff's digestive system.

Nearly two weeks later, on August 23, 2018, the plaintiff told a nurse that he had been sexually assaulted by officers on August 9, 2018, in connection with the key in his rectum. The nurse reported the complaint as a potential issue under the Prison Rape Elimination Act, and correctional officer Nathan Benz investigated by reviewing incident reports and available video footage and interviewing the plaintiff and other employees involved in the incident. In his interview with Benz, the plaintiff stated that after being returned from the hospital the first time, an officer had "spread his buttocks and rubbed against his anus several times" while the plaintiff was naked. Dkt. No. 51 at 22. Benz concluded that the sexual assault allegations were without basis because the plaintiff had been clothed during the searches, and because the searches on August 9, 2018 were directly related to the fact that the plaintiff had placed a key in his rectum.

D.    Analysis

1.    *Fourth Amendment Violation*

The video evidence is not dispositive for either party, and construing the other facts in the plaintiff's favor, a reasonable jury could find that he was subject to a penetrative anal cavity search. Accordingly, the court will proceed as if the plaintiff was subject to a penetrative anal cavity search at 4 p.m. on August 9, 2018, after staff searched his feces and failed to find the key. The

18

question is whether that search was unreasonable in violation of the Fourth Amendment.

In evaluating the constitutionality of a body cavity search of a pre-trial detainee, "[c]ourts must consider the scope of the particular intrusion, the manner in which it is conducted, the justification for initiating it, and the place in which it is conducted." Bell, 441 U.S. at 546. In Bell, the Supreme Court held that visual body cavity searches of pre-trial detainees did not require probable cause. Id. at 560. The Supreme Court noted that while the searches are highly invasive and could potentially lead to abuse, these concerns were outweighed by the "significant and legitimate security interests of the institution." Id. In 2012, the Supreme Court went a step further, holding that institutions do not need reasonable suspicion of contraband in order to conduct a visual genital search of detainees and force them to undergo a degrading protocol known as a "cough and squat." Florence v. Bd of Chosen Freeholders of Cty. of Burlington, 566 U.S. 318, 330 (2012). This is because correctional officers have a strong interest in "preserving internal order," which includes "ensur[ing] the safety of inmates and corrections personnel" and "prevent[ing] escape or unauthorized entry." Bell, 441 U.S. at 546–47. In balancing the individual's privacy interest with the institution's security concerns, "deference must be given to the officials in charge of the jail unless there is 'substantial evidence' demonstrating their response to the situation is exaggerated." Florence, 566 U.S. at 330. In Isby v. Duckworth, the Seventh Circuit upheld an anal cavity search for a gun or its component parts because

the search was conducted in a reasonable manner—in a private room by a medical professional. 175 F.3d 1020 (Table), 1999 WL 236880, at *2 (7th Cir. April 21, 1999) (unpublished).

The court finds that here, the scope, manner and justification of the purported anal cavity search demonstrate that it was constitutional. The scope of the search was narrow; the correctional officers searched only in places where the plaintiff might have been able to hide a key (his hands, feet, mouth, feces and anal cavity). The cavity search was a last resort after other, less invasive searches—and several entreaties for the plaintiff to voluntarily surrender the key—were unsuccessful. The manner in which the search was purportedly conducted was also reasonable—in a private room, by jail staff, with several employee witnesses present.[4] C.f. Campbell v. Miller, 499 F.3d 711, 718–19 (7th Cir. 2007) (anal cavity search was unreasonable when performed on arrestee in a backyard). The justification also was reasonable: the correctional officers knew, based on an x-ray, that the plaintiff had had the key in his rectum. After searching the plaintiff's hands, feet, mouth and feces to no avail, and suspecting that the plaintiff might either have swallowed the key or placed it in his rectum again, the officers searched the plaintiff's anal cavity. Finally, a possibly suicidal detainee possessing a restraint key presented a legitimate security risk to the detainee, the institution staff and other inmates.

---

[4] There is no evidence in the record indicating whether the officers used gloves or otherwise conducted the purported cavity search in a manner consistent with good hygiene, as suggested by the Seventh Circuit in Isby. 1999 WL 236880, at *2. That is not the issue before the court on summary judgment.

The court acknowledges that digital penetration would not be reasonable under many—maybe most—circumstances. But this was not most circumstances. The jail staff tried several different methods of obtaining the key, resorting to the cavity search only when those methods had failed and when the plaintiff refused to provide the key or allow it to be extracted medically. Given the Supreme Court's holding in Florence that no reasonable suspicion is needed for visual body cavity searches of pretrial detainees, where there is strong suspicion (indeed, at one point, proof) of potentially dangerous contraband in a detainee's body cavity, a brief, albeit highly intrusive, tactile search of that cavity conducted in private by jail staff is not unconstitutional. The court will grant summary judgment in favor of the defendants on the plaintiff's Fourth Amendment claim.

2.     *Fourteenth Amendment Violation*

In the amended complaint, the plaintiff alleged that several of the defendants pinned him against the cell wall, struck him several times in the head and applied pressure to his back and shoulders, restraining him while they did the search. Dkt. No. 6 at 2-3. He characterized this as "unnecessary and excessive force." Id. at 3. As the court has discussed above, this is a Fourteenth Amendment due process claim, given that the plaintiff was a pretrial detainee when these events occurred.

The plaintiff did not address his Fourteenth Amendment excessive force claim in his briefing, and the defendants ask the court to deem the argument

waived. Because the plaintiff is representing himself, the court declines to deem the argument waived.

The Fourteenth Amendment governs a pretrial detainee's claim of the use of excessive force. Kingsley v. Hendrickson, 135 S. Ct. 2466, 2472 (2015). "[A] pretrial detainee must show only that the force purposely or knowingly used against him was objectively unreasonable." Id. at 2473. "[O]bjective reasonableness turns on the 'facts and circumstances of each particular case.'" Id. (quoting Graham v. Connor, 490 U.S. 386, 396 (1989)). Courts must consider what the officer knew at the time that the force was used. Id. Courts "must also account for the 'legitimate interests that stem from [the government's] need to manage the facility in which the individual is detained,' appropriately deferring to the 'policies and practices that in th[e] judgment' of jail officials 'are needed to preserve internal order and discipline and to maintain institutional security.'" Id. (quoting Bell, 441 U.S. at 540, 547). The following factors bear on reasonableness of force: "the relationship between the need for the use of force and the amount of force used; the extent of the plaintiff's injury; any effort made by the officer to temper or to limit the amount of force; the severity of the security problem at issue; the threat reasonably perceived by the officer; and whether the plaintiff was actively resisting." Id.

Other than the plaintiff's allegations, there is no evidence that he was struck in the head during the wall hold, that officers used more force than necessary during any of the various changes in and out of the suicide gown or that the use of pepper spray was excessive under the circumstances. While the

court has treated the plaintiff's amended complaint as an affidavit, and thus it is evidence, "[c]onclusory allegations alone cannot defeat a motion for summary judgment." Thomas v. Christ Hosp. and Med. Cntr., 328 F.3d 890, 892-83 (7th Cir. 2003). The fact that the conclusory allegations are sworn does not change that fact. See Lujan v. Nat'l Wildlife Fed., 497 U.S 871, 888 (1990).

The video footage is inconclusive as to what happened in the holding cell. But if, as the plaintiff alleges, he had been struck several times on the head, or pinned down and handled in a violent manner, he ought to have medical records indicating as much—jail medical unit records, for example, or hospital records from his visit there. He might have affidavits from other jail inmates or staff members. The only mention of "punching" in the evidence the plaintiff presented the court was his own statement to the PREA investigator, claiming that Sobel "punched" him in the back of the head. Dkt. No. 69-1 at 5. The plaintiff mentioned in his inmate grievance of September 6, 2018 that Hannah, Briggs, Sobek and other officers "inflict[ed] pain against" him. Id. at 35. The only evidence that the plaintiff was subjected to excessive force are his own conclusory allegations that he was, and those are not enough to defeat summary judgment.

Nor did the use of pepper spray constitute excessive force. Kingsley requires courts to consider the need for the force, the amount of force used, the extent of the subject's injury, the officer's attempt to curb the force, the severity of the perceived threat and whether the subject was actively resisting. Kingsley, 135 S. Ct. at 2472. By the time the defendants used the pepper stray, there

was a demonstrated need for some form of intervention: the plaintiff had been in possession of the key for over twenty-four hours, had been taken to the hospital twice to try to extract the key medically, had had a bowel movement which had not produced the key, had been subject to one-on-one monitoring and had been asked multiple times to voluntarily surrender the key. Defendant Mikulecky then gave the plaintiff the opportunity to produce the key rather than be pepper-sprayed; he refused. Dkt. No. 69-1 at 42. Mikulecky then "delivered (1) (1) second burst of Oleoresin Capsicum, striking [the plaintiff] in the face area." Id. See also, id. at 57, 59-60 (photos of plaintiff). It was only then that the plaintiff surrendered the key.

The Sixth Circuit has held that the use of pepper spray does not constitute excessive force where a physically imposing individual refused to comply with police requests, even when told he'd be sprayed if he did not. Monday v. Oullette, 118 F.3d 1099, 1104 (6th Cir. 1997). The Seventh Circuit has held that when an officer used force only when a prisoner disobeyed a command designed to maintain order in the prison, and then applied additional force when the inmate remains defiant, that additional force did not violate the Constitution. Guitron v. Paul, 675 F.3d 1044, 1046 (7th Cir. 2012). Here, as in Bennett v. Sobek, 336 F. Supp. 3d 933, 938 (E.D. Wis. 2018), the defendants resorted to pepper spray only when other measures proved ineffective, and used only a single, one-second burst.

There is no evidence other than the plaintiff's conclusory claims that he was subject to excessive force through beating or hitting, and the use of the

pepper spray under these circumstances did not constitute excessive force. The court will grant summary judgment in favor of the defendants on the plaintiff's Fourteenth Amendment excessive force claim.

## III. CONCLUSION

The court **DENIES AS MOOT** the plaintiff's motion to amend the complaint, dkt. no. 26, and **DENIES AS UNNECESSARY** the plaintiff's motion to amend the complaint, dkt. no. 36.

The court **GRANTS** the plaintiff's motion to withdraw the amended complaint. DKt. No. 28.

The court **DENIES** the plaintiff's motions to compel. Dkt. Nos. 37, 45.

The court **GRANTS** the plaintiff's motions for evidentiary review and an evidentiary hearing to the extent that they ask the court to review his evidence and **DENIES** his request for a hearing. Dkt. Nos. 46, 47.

The court **DENIES AS MOOT** the plaintiff's motion for an order to view exhibit videos. Dkt. No. 75.

The court **DENIES** the plaintiff's motions to appoint counsel. Dkt. Nos. 42, 70.

The court **GRANTS** the defendants' motion for leave to file an oversized statement of facts. Dkt. No. 48.

The court **GRANTS** the plaintiff's motion to file stipulated facts and exhibits. Dkt. No. 69.

The court **GRANTS** the defendants' motion for summary judgment. Dkt. No. 50.

The court **ORDERS** that this case is **DISMISSED with prejudice**. The court will enter judgment accordingly.

This order and the judgment to follow are final. A dissatisfied party may appeal this court's decision to the Court of Appeals for the Seventh Circuit by filing in this court a notice of appeal within 30 days of the entry of judgment. <u>See</u> Fed. R. of App. P. 3, 4. This court may extend this deadline if a party timely requests an extension and shows good cause or excusable neglect for not being able to meet the 30-day deadline. <u>See</u> Fed. R. App. P. 4(a)(5)(A).

Under limited circumstances, a party may ask this court to alter or amend its judgment under Federal Rule of Civil Procedure 59(e) or ask for relief from judgment under Federal Rule of Civil Procedure 60(b). Any motion under Federal Rule of Civil Procedure 59(e) must be filed within 28 days of the entry of judgment. The court cannot extend this deadline. <u>See</u> Fed. R. Civ P. 6(b)(2). Any motion under Federal Rule of Civil Procedure 60(b) must be filed within a reasonable time, generally no more than one year after the entry of the judgment. The court cannot extend this deadline. <u>See</u> Fed. R. Civ. P. 6(b)(2).

The court expects parties to closely review all applicable rules and determine, what, if any, further action is appropriate in a case.

Dated in Milwaukee, Wisconsin this 27th day of March, 2020.

**BY THE COURT:**

**HON. PAMELA PEPPER**
**Chief United States District Judge**